# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom Phillip
Joshua D. Uller
Kelly A. Welsh

517 East Wisconsin
Suite 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

January 23, 2020

Honorable Lynn Adelman
U.S. District Court
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI 53202

RE:   *United States v. Shogun Anthony*
       Case No. 18-cr-10-LA

Dear Judge Adelman:

Five years ago Shogun Anthony helped rob two pharmacies. Since that time he has avoided trouble, worked, and been a devoted father to his two children. He also has done well on pretrial release for the last two years. His only prior conviction is a 2012 marijuana possession case when he was 18 years old where he received a time-served sentence of three days in jail. Given the passage of time since these robberies, Shogun's otherwise negligible record, and his post-offense rehabilitation, supervision would plainly be appropriate were it not for the nature of the offense.

But ultimately even the seriousness of these offenses should not interfere with placing Shogun on supervision given the above considerations and his unique individual circumstances. As explained below, Shogun experienced extremely traumatic events in childhood, which in combination with difficult life circumstances at the time of the offense provide perspective about why he would have struggled as a young man. This background also shows why Shogun's decision to change his life well before he was

arrested and his personal growth are so impressive. This change began with him ending his brief involvement in criminal activity and it has continued because Shogun wanted to be there for his own children and provide for them in a way his own parents did not. While his difficult upbringing doesn't excuse or justify his conduct, his progress in the years since these offenses shows that he is not a danger to the community and that incarceration is unnecessary to achieve the purposes of sentencing. To the contrary, incarceration would interfere with his successful rehabilitation occurring over the last five years.

## A.      Shogun's Childhood and Early Adulthood

Shogun's upbringing is something he doesn't much like to talk about. And some of the events that have shaped his life took place when he was too young to even remember them. The earliest events in his life were discovered by the defense team through reviewing court and social history records, although Shogun had heard from family members that his father had been severely abusive to his mother. Like many other people who find themselves facing criminal charges, Shogun lacked strong parental support—his father was frequently in prison and his mother was a drug addict. But those broad strokes don't begin to convey how traumatic Shogun's childhood was. To understand that, one has to look at the details of that trauma, which began even before he was born.

Shogun's parents are Malissa Sibley and Eddie Anthony. Shogun was born with cocaine in his system, and was small and underdeveloped, but was otherwise healthy. His mother was referred to the Department of Children and Families by the hospital, but she denied she had a problem and refused AODA treatment.[1] When Shogun was about six months old, his mother was holding him when Eddie began beating her in the head with an iron and knocked her and Shogun to the floor. After she fell, Eddie continued to beat her—so hard that the iron broke, at which point he began beating her with a telephone until it too broke.[2] This beating was followed in the next couple years by other very violent assaults. The ones that resulted in criminal charges and jail sentences were for beating her with a phone (again) (February 5, 1995), punching her (March 16, 1995), and biting a chunk of flesh from her shoulder (August 4, 1996). Eddie and Malissa split when Shogun was a toddler and Shogun saw Eddie infrequently until his teenage years.

Yet, despite Eddie's violence and criminality, he may have been the better parent. Shogun's brother, E.J. was born when Shogun was two—he was the third of Malissa's

---

[1]  *See* Ex. 1 (Department of Children and Families Records).
[2]  *See* Ex. 2 (Criminal Complaint, Case No. 94CF742).

children to be born with cocaine in his system.[3] When Shogun was three, he and his siblings were taken away from Malissa, because of her crack addiction and neglect. This was after Shogun's toddler brother E.J. ingested cocaine and suffered seizures. Shogun then was raised by his maternal aunt, Elizabeth West. Social services records reflect that at age 4, Shogun had significant developmental delays. Records indicate Shogun was "slow in certain areas" and had "speech delays."[4] Ms. West recalls basically having to teach the kids to eat as they had survived on candy when Malissa had them[5]. After moving in with Elizabeth, Shogun rarely saw his mother until he was an adult; he then began checking in on her. She remains a lifelong drug addict who is unable to provide him with any meaningful support.

When Shogun was in middle school, Eddie reestablished a relationship with Shogun and made a point of having regular contact with him and doing things together. Shogun says Eddie wasn't violent towards him and warned him to avoid drugs and other negative influences. Shogun remembers fondly the times that they went to the Mary Ryan Boys and Girls Club on Sherman and Burleigh to play basketball, pool, and video games. After his relationship with Malissa ended, Eddie had married a woman named Sabrina Junior and the couple had three daughters. Shogun spent a lot of time with the family. His dad brought him over most weekends and sometimes during the week. Shogun also was close with Eddie's wife, Sabrina, who was like another mom to Shogun.

A week before Shogun was to begin his sophomore year in high school, he saw his father's home on the news surrounded by yellow police tape. He then heard the horrifying news that his father had murdered his stepmother with an ice pick, stabbing her 45 times while Shogun's younger half-sisters hid in the closet.[6] Shogun was devastated with grief, losing his stepmother, half-sisters (who were forbidden from seeing him), and his father (to life in prison), all in the same day.

The impact on Shogun was severe. He lost interest in school, his hair started falling out (which embarrassed him and caused him to wear a hat all the time), and he had little support in coping with the enormous trauma he was experiencing (and continues to experience) from his father's brutal murder of Sabrina. He was depressed, angry, and oppositional and took it out on those around him, moving out of his aunt's house within the year. He dropped out of school and began self-medicating with marijuana and, later, pills.

---

[3]  *See* Ex. 1 (Department of Children and Families Records).
[4]  *See* Ex. 1 (Department of Children and Families Records).
[5]  Buxton interview with Elizabeth West, 5/18/18.
[6]  *See* Ex. 3 (Criminal Complaint, Case No. 2010CF004153).

Shogun eventually moved in with his girlfriend, Jayla Lipsey, and her mother. He lived there for about two years until the family was evicted and their new home wasn't big enough for Shogun. After that Shogun moved in with his sister Candice, but with her growing family there eventually wasn't room for Shogun there either. After a brief stint with his other sister, he became homeless, shuttling between relatives, friends, bus stops, the hallways of apartment buildings, Jayla's, or wherever he could stay. In 2013, when Shogun was 20, he stayed briefly with his mother, but that ended when police were called after Malissa stabbed him in the back with a knife. Shogun had dared to interfere in an argument she was having with her drug dealer.

When Shogun turned 21, he was still homeless. One of the places Shogun stayed when he was desperate was the home of a childhood friend, Marquise Houston. Unfortunately, Houston and his friends were involved in robbing pharmacies. When Houston pressured Shogun to participate in the CVS robbery, Shogun felt like he had little choice. He was homeless, out of school, and struggling with using pills when he committed the robbery and the subsequent one. While Houston and the others were involved in numerous robberies and were violent, Shogun was a follower and not armed in the two robberies.

Although Shogun wasn't immediately caught, he withdrew from that activity on his own and disassociated himself from that group. He also learned that Jayla was pregnant. In February 2016, Jayla and Shogun had a daughter, Jariyha. This changed Shogun's entire outlook on life. He dedicated himself to being the best father he could be, which he recognizes is an ongoing process. He attended doctor's appointments with Jayla when she was pregnant and was at the hospital for the birth.[7] He began working temp jobs more steadily and spent time raising his daughter. Shogun and Jayla broke up before Jariyha's birth, but they remained on good terms and have handled co-parenting well.

### B.      The Offense and the Guidelines

Unquestionably, these offenses, armed robberies of a pharmacy, were serious. In each, Shogun accompanied one or two others who were armed. Shogun himself wasn't armed, and no one was hurt. That mitigates these offenses to a degree, but the danger inherent in these robberies and the impact on the victims still make them very serious. Shogun says that he felt pressured to go along with the robberies, and was in a vulnerable position because he was homeless and using pills at the time, but knows that he alone made the

---

[7]  Buxton interview with Jayla Lipsey, 5/25/18 ("When I was pregnant we were not together (as a couple) but we was trying to work it out. He was there for everything, he came to the appointments. He was there at the hospital when I gave birth. He was there after I gave birth.").

decision to participate and he is deeply ashamed he did. From the discovery it appears that Shogun's co-actors in the robbery were behind many similar robberies. But for Shogun, these were aberrations.

The fact is that 26-year-old Shogun Anthony is much different than the 21-year-old Shogun who participated in these offenses. He was still maturing then, still struggling with grief and homelessness, and was generally lost. In the past five years he has no convictions. He is extremely remorseful for what he did but feels like the person who committed these crimes was an entirely different person.

According to the PSR, Shogun's sentencing guidelines range is 63 to 78 months. As this Court has recognized previously, while the Court must "consider the type and range of sentence recommended by the guidelines," it "may not perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case." *United States v. Morgan*, 255 F. Supp. 3d 869, 871 (E.D. Wis. 2017) (quoting *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015)). "Ultimately, it falls on the district court to weigh and balance the various factors and to 'make an individualized assessment based on the facts presented.'" *Id.* (citations omitted).

In this case those guidelines don't take into account the unique features of Shogun's case and background. In addition to failing to account for his tragic upbringing, they don't consider the length of time without a conviction since the offense, his conduct on bail, or his post-offense rehabilitation.[8] These are discussed in more detail below.

**C.    Shogun's Progress Since His Arrest.**

1.    Shogun has a son.

The offenses in this case took place on November 23, 2014, and February 24, 2015, but there were no charges until a federal criminal complaint was filed on December 28, 2017. Shogun was arrested about three years after the offenses—on December 25, 2017. When arrested, he was cooperative and admitted his involvement. He appeared in federal court on January 2, 2018, and was detained. After he found a suitable residence with his cousin, Anthony Thomas, bail conditions were set and Shogun was released on March 5, 2018. This time in jail was more than two months longer than the only other period of

---

[8] Counsel notes that even Wisconsin's short-lived sentencing guidelines in the early 2000's included probation as an option for persons sentenced for armed robbery if the offense severity or offender's risk assessment were low or medium. *See* O'Hear, WISCONSIN SENTENCING IN THE TOUGH-ON-CRIME ERA at 134-35 (UW Press 2017).

incarceration Shogun ever had served–three days–and this sudden incarceration three years after the robberies had a significant shock effect on Shogun. Among other things, he struggled greatly with his separation from his daughter.[9]

At the time of his arrest, Shogun was working and living with his girlfriend Monique Robinson and her family. She was pregnant and Shogun was devastated when he was arrested because he wasn't there to support Monique at the end of her pregnancy. Monique's pregnancy was considered high-risk due to low levels of the pregnancy associated protein-A, which can lead to preterm delivery, preeclampsia, and stillbirth. Before his arrest, Shogun tried to alleviate some of Monique's anxiety by caring for her older children, helping out with cooking and cleaning, and rubbing her belly and her back.[10]

Shogun and Monique's son, Anthony Robinson, was born via cesarean section on March 28, 2018. Despite weighing only 4 pounds 6 ounces at birth, he was otherwise healthy. Shogun was delighted to have a son, and grateful to have been released on bail in time to attend his birth.

 2. Shogun dedicates himself to work and family.

Since his release on bail, Shogun hasn't been charged with any new offenses. He has worked throughout at various temporary agencies and has diligently sought permanent employment. He has remained in contact with his probation agent and his lawyers, making his appointments with both. In his free time, he likes to be with his kids or play basketball with his brother.

The following gives an overview of his work history during the past few years. Before his arrest in 2017, Shogun worked for a number of months at Hotel Metro as a dishwasher and he also worked for temporary agencies. After his release on bond in March of 2018, Shogun attended a job program through Northcott Neighborhood House, and then was placed at Bonafide Builders.[11] When this job program ended, Shogun returned to temp work at Preferred Staffing and Staffworks, getting placed at Kleen Test, General Mills,

---

[9] While in custody, Shogun gave his lawyers a letter he had written to the judge hoping for bail. It wasn't relevant to the bail issues, but revealed much about Shogun's attachment to his daughter: "I hope and pray everyday I get a chance to be in my daughter life again. Last day I spent with her was on Christmas Eve, got to see her open her gifts and that big smile on her face. Also I pray to be there and see my son born too."

[10] Buxton Client Conference, 1/19/18.

[11] *See* Ex. 5 (Northcott Neighborhood House Records).

and Opportunities, Inc. Then when temporary placements became scarce there, he also sought placements with InStaff and Elite Staffing. He continues to alternate between these temporary agencies while seeking a permanent position. He often works third shift.

The attached letters from his closest family members recognize that Shogun has changed dramatically in recent years. His aunt Elizabeth West, who raised him, notes that because he was born to a drug-addicted mom, the odds were stacked against him early.[12] But she also recalls that Shogun was "a good, smart boy" while he was growing up. After Sabrina's murder, he started going bald from stress and became disrespectful. She says that now Shogun is the young man she envisioned, that "he always calls to see if I need anything done," and that he's "always working to become a better man for his children."

Shogun's sister Candice says that although Shogun was "dealt a bad card since birth," he's completely turned around and that he's a "hard worker, a wonderful father, great uncle and caring brother," she says. When he isn't working himself, Shogun helps care for her kids so she can work.[13] Anthony Thomas, the man Shogun has lived with since being released on bail, says that Shogun has done great since he got out, working and spending time with his kids, along with making better choices in life.[14]

Since Shogun's arrest, FDSW's mitigation specialist, Luli Buxton, has had a number of conversations with Shogun's family. They uniformly report that Shogun is an engaged father. Not long after Shogun's release on bail, his daughter's mother, Jayla Lipsey, reported that Shogun "turned his life when I told him I was pregnant," and "then he really shifted around when they told him I'm having a girl. He always wanted to have a girl."[15] Regarding his interaction with their daughter, Jariyha, she said:

> Jariyha crazy about her daddy. Right now Jariyha is taking a nap, the first thing she gonna do when she wakes up she is gonna call her dad. She is so attached to him. They see each other every day. Yesterday he couldn't see her, but every day, literally every day. He picks her up, takes her to the park, takes her to get something to eat. Jariyha crazy about her dad. If I have one child that gives me a break its Jariyha because

---

[12] *See* Ex. 9 (Elizabeth West Letter).
[13] *See* Ex. 10 (Candice Sibley Letter).
[14] *See* Ex. 11 (Anthony Thomas Letter).
[15] Buxton interview with Jayla Lipsey, 5/25/18.

> Shogun's always coming to get her. Sometimes I tell him I
> want time to do something with her too.[16]

In another interview in August 2019, Jayla reported that Shogun "provides so much" for Jariyha, like shoes, clothes, etc., and that Jariyha loses sleep when Shogun is not around.[17] Shogun's sister Mercedes says that Shogun "loves his kids. He be trying to get them all the time. Just with his son yesterday. He knows how to change diapers, feed the babies, make the bottles." She also said he's patient with the kids, plays with them, and takes them to the park all the time.[18] These sentiments were echoed by his sister Candice and his cousin and roommate, Anthony Thomas, Jr.[19]

    3.   Shogun takes advantage of treatment.

The one blip on Shogun's adjustment while on pretrial release was that after over a year without using any drugs, this summer he started testing positive for marijuana, which he began using to cope with the stress of his upcoming sentencing. After several positive tests, he began intensive outpatient substance abuse treatment at St. Charles Youth and Family Services. Shogun's group met four times a week for four hours a day after his initial referral on October 11, 2019. He had several negative tests and graduated to a lower level of care on January 2, 2020, which require him to meet with an individual counselor once a week.[20] His success at St. Charles has been remarkable as he has been able to stop using marijuana and found his counseling to be beneficial in dealing with his stress and other issues.

Shogun's counselor, Mary Rodgers, wrote a letter to the Court outlining Shogun's course of treatment.[21] Ms. Rodgers says that Shogun "has shown tremendous progress and stability," and has been dedicated to meeting his goals. She was particularly impressed by his "initiative in setting his goals and being independent in working towards them." She noted the efforts he had made in seeking additional employment and educational opportunities during his course of treatment and believed that Shogun offered "a true example of seeing how treatment can be successful in providing the skills and stability to

---

[16] *Id.*
[17] Buxton interview with Jayla Lipsey, 8/9/19.
[18] Buxton interview with Mercedes Sibley, 10/11/19.
[19] Buxton interview with Candice Sibley, 7/24/19 ("Shogun is a really good dad. . . .His kids definitely matured him. He got something to live for"); Buxton interview with Anthony Thomas, 10/1/19 ("When Shogun with his kids they be always smiling, laughing, they don't want to leave. They come over here. They like it here").
[20] *See* Ex. 6 (Certificate of Completion, St. Charles Youth and Family Services).
[21] *See* Ex. 7 (Mary Rodgers Letter).

Honorable Lynn Adelman
January 23, 2020
Page 9

move forward in living a desired quality life." Perhaps most impressive, however, was the following observation from Ms. Rodgers: "It is not often that clinicians get to see the results of treatment within a 3-4 month time span. Mr. Anthony has been an anomaly and has shown tremendous success."

Given the success and impact of this counseling, it's hard not to wonder how Shogun might have fared if some sort of counseling had been available for him after his father's murder of Sabrina Junior, or perhaps even much earlier. In any event, it shows that Shogun is open and motivated to participate in treatment that will help him in the future and that counseling that is available in the community is likely to be productive.

In addition to his recent counseling, Shogun took another positive step this summer that has provided him with needed support and guidance. Shogun began working with a mentor, Marlon Grice, from True Hope, Inc. Mr. Grice has worked with Running Rebels for years and recently began looking for ways to provide mentoring to older men (over age 25) for whom few such resources exist. In that role, he has been acting as mentor to some men in the federal reentry program and he agreed to also mentor Shogun. Mr. Grice's letter reflects that over the past six months he has been in contact with Shogun at least weekly helping him grow as a person and become a productive member of the community.[22] He says Shogun "appears to be a young man determined to make changes and connect himself with positive people" and that he is "consistently seeking direction and has not been afraid to ask questions for deeper understanding."

Since reducing his AODA commitment after successfully completing the intensive outpatient program, Shogun has enrolled in GED classes at the Social Development Commission, which he attends after working third shift. "I'm really impressed that he takes the initiative," said Lynn Clark, his teacher at SDC.[23] A`t the moment he is working through Preferred Staffing at Opportunities, Inc. To work the 11 p.m. to 7 a.m. shift he has to arrive to meet the van by 9 p.m. and he usually gets back around 9 a.m.

**D.      Shogun's History of Trauma and Youth Should be Considered in Reaching an Appropriate Sentence**

As the above discussion indicates, Shogun Anthony's childhood and young adulthood were marked by a number of factors that are known to delay and impede a young person's development and affect their ability to make good decisions. He had an

---

[22] *See* Ex. 8 (Marlon Grice Letter).
[23] Buxton interview with Lynn Clark, 1/15/20.

incarcerated parent, there was severe domestic violence in the home, he was removed from his home by child protective services, and not only was his mother a drug addict but he was born with cocaine in his system. This was on top of the major trauma involving his father's murder of his stepmother and its aftermath, including the loss of many family members he was close to, his abandonment by his mother, and her stabbing him. In addition, at the time he committed these offenses he still was young—21—and his brain was still developing.

The synergistic effect of all these factors, which are briefly discussed below, would've interfered with Shogun's development and made him vulnerable to impulsivity, poor decision-making, and criminal activity. Thus, it is not surprising, that Shogun had some difficulties as he matured into a young adult. *See also United States v. Morgan*, 255 F. Supp. 3d 869, 872 (E.D. Wis. 2017) (recognizing that the defendant's age, cognitive limitations, mental health issues, and substance abuse likely affected his ability to make good decisions and made him "more susceptible to peer pressure and to making impetuous and ill-considered decisions"). His homelessness and drug addiction would have made him only more susceptible.

Shogun's life has been marked by trauma. Both neurological and epidemiological research confirm that early childhood trauma greatly impacts the developing brain and later outcomes in life. [24] The changes to the brain that occur in response to trauma include exaggerated response to threat; increased anxiety, aggression and arousal; impaired memory, attention, and concentration; decreased impulse control; and increased sensation seeking and pleasure seeking behavior.[25] These changes greatly increase the risk of criminal justice system involvement. And this association between early childhood trauma and criminogenic risk has been used by the U. S. Department of Justice's Office

---

[24] Epidemiological studies such as the ACE study mirror these resultant impairments. A large body of science on Adverse Childhood Experiences, or ACES, have associated childhood trauma with a number of different negative health outcomes. These outcomes include mental health problems such as depression, anxiety, PTSD, and suicide attempts; behavioral problems such as drug and alcohol abuse and unsafe sexual activity; lower education, occupation, and income, an increased risk of chronic disease such as cancer and diabetes, and shorter overall life expectancy. (*See* V. J. Felitti et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults*, 14(4) American Journal of Preventative Medicine 245 1998), at https://doi.org/10.1016/S0749-3797(98)00017-8; R. F. Anda et al., *The Enduring Effects of Abuse and Related Adverse experiences in Childhood: A Convergence of Evidence from Neurobiology and Epidemiology*, 256(3) European Archive of Psychiatry and Clinical Neuroscience 174 (2006), at https://doi.org/10.1007/s00406-005-0624-4).

[25] *See generally* J. Douglas Bremner, *Traumatic Stress: Effects on the Brain*, 8(4) Dialogues in Clinical Neuroscience 445 (2006); Nadine Burke Harris, The Deepest Well: Healing the Long-Term Effects of Childhood Adversity (Houghton Mifflin Harcourt 2018).

of Juvenile Justice and Delinquency Prevention (OJJDP) in determining the likelihood of juvenile delinquency.

Any traumatic experience, such as the murder of one's stepmother by one's father, increases the likelihood of negative outcomes later on in life. But research suggests that multiple co-occurring traumas greatly increase this risk. This concept of cumulative risk is detailed in the neurological and epidemiological literature on trauma, as well as accepted by the OJJDP. "There is no single risk factor that can predict who is likely (or not likely) to engage in criminal behavior, but the effect is cumulative: the more risk factors present in a youth's life, the greater the probability of the youth committing delinquent acts." Development Services Group, Inc., *Risk Factors for Delinquency* (Office of Juvenile Justice and Delinquency Prevention 2015).[26]

This research suggests that the multitude of traumatic events Shogun experienced in childhood and adolescence would interfere with his ability to make good decisions as a young man and put him at greater risk for criminal justice involvement, partially explaining his participation in the offense. But this research also suggests that, given the events of his childhood, Shogun's voluntary withdrawal from criminal activity and his persistence in personal improvement indicate great resolve and strength of character. And on top of that is the fact that the brain doesn't stay immature forever. *See*, *e.g.*, *Miller v. Alabama*, 567 U. S. 460, 472 (2012) (an offender's youth "enhance[s] the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed'") (citation omitted).

Instead of using his past to justify his anti-social behavior, Shogun has tried to use it as motivation to make something of himself. What's different about this case is that we don't have to just accept Shogun's word that he won't be involved in this type of activity or that he'll work to better himself: he has already shown over the past five years that he will do so. His efforts to overcome the hurdles he has faced should provide confidence that he is not a danger to the community and is able to be a productive person. Time on supervision will provide structure, assistance, and incentives to keep him on the right path and will serve as additional punishment.

---

[26] Available at https://www.ojjdp.gov/mpg/litreviews/Risk%20Factors.pdf.

## E.      Appropriate Sentence

As noted, Shogun's only criminal conviction, for marijuana possession, resulted in a sentence of three days. Following his arrest in this case, he spent approximately 70 days in jail before being released on bail. That period of jail was the longest period of incarceration Shogun ever served and likely served the purposes of incarceration. *See Morgan*, 255 F. Supp. 3d at 873 ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend"). His sudden incarceration three years after the robberies had a significant shock effect on Shogun, but, beyond that, he also had already withdrawn from criminal activity. Given that voluntary withdrawal and the length of time he has avoided serious criminal behavior, incarceration is unnecessary to protect the public.

In fact, research indicates that lengthening a prison term does not decrease recidivism, and, compared to community sanctions, incarceration appears to have a criminogenic effect.[27] While some may argue that long prison sentences reduce crime through incapacitation, the validity of that theory depends on "provid[ing] a plausible estimate of how many crimes an incarcerated individual would have committed, were s/he free in the community rather than confined in prison" (Wemink *et al.*, 2013 at 579). In Shogun's case, there is the rare opportunity to identify the incapacitation effect before sentencing given the length of time between the crimes and his sentencing date. Given the fact that he committed no new crimes during this time, it is reasonable to expect no incapacitation effect, and therefore incapacitation is unnecessary, and likely counterproductive, to reduce recidivism.

It's also worth considering that we have reason to believe Shogun will do well in the community. He has established a positive support network that includes a mentor, an AODA treatment provider, and a good relationship with the probation office; he's taking classes to get a GED, he's been working, and he's an active father. He has disassociated himself from the bad influences of his early adulthood. Given those circumstances,

---

[27] *See, e.g.,* H. Wermink et al., *The Incapacitation Effect of First-Time Imprisonment: A Matched Samples Comparison,* 29(4) JOURNAL OF QUANTITATIVE CRIMINOLOGY 579 (2013), at https://doi.org/10.1007/s10940-012-9189-3; T. C. Cullen, C. L. Jonson, and D. S. Nagin, *Prisons do not Reduce Recidivism: The High Cost of Ignoring Science,* 91(3) THE PRISON JOURNAL 48S, 60S (2011) ("it is essential to screen offenders for their risk level and to be cautious about imprisoning those not deeply entrenched in a criminal career or manifesting attitudes, relationships, and traits associated with recidivism"), at https://doi.org/10.1177/0032885511415224.

additional prison would not just interfere with his ongoing successful rehabilitation, but also potentially increase the risk of recidivism. *See* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (Sentencing Project 2010)[28] ("when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.").

Given the length of time since these offenses, the substantial hardships Shogun faced as a child and teenager, and his post-offense rehabilitation, a sentence of time-served is "sufficient but not greater than necessary" to achieve the purposes of sentencing. A longer sentence is not needed to deter, to protect the public, or for rehabilitation. And while time-served is a short sentence given the seriousness of the offense, other punishment has been imposed through branding Shogun a felon, the two years he already has been supervised on bail, and additional supervision. *See United States v. Colla,* 2008 WL 5000220, *6 (E.D. Wis.) (recognizing that "'custodial sentences are qualitatively more severe than probationary sentences of equivalent terms,'" but probationers are "'nonetheless subject to several standard conditions that substantially restrict their liberty'" (quoting *Gall v. United States,* 128 S. Ct. 586, 595-96 (2007)). The Court also could order house arrest as a condition of supervision if it believes additional punishment is necessary. Accordingly, the defense requests a sentence of time-served and three years on supervised release that includes counseling as a condition and that gives flexibility to the probation office in implementing that condition.

Respectfully submitted,


/s/    *Craig W. Albee*

CWA/cm

c:      USPO Maria J. Mahmoudi

---

[28] Available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.